# Case Docket Entries

CC-37-2024-C-10

| Court: | **Circuit** | County: | **37 - Pleasants** | Created Date: | **5/16/2024** | Security Level: | **Public** |
|---|---|---|---|---|---|---|---|
| Judge: | **Timothy L. Sweeney** | Case Type: **Civil** | | Case Sub-Type: **Tort** | | Status: | **Open** |

Related Cases:

Style:   **DENNIS SOLE v. EXACTECH, INC.**

| | Entered Date | Event | Ref. Code | Description |
|---|---|---|---|---|
| 1 | 5/16/2024 11:26:54 AM | E-Filed | | Complaint |
| | 1-1  5/16/2024 | Civil Case Information Statement | | |
| | 1-2  5/16/2024 | Complaint - COMPLAINT | | |
| | 1-3  5/16/2024 | Transmittal | | |
| | 1-4  5/16/2024 | Summons | | |
| 2 | 5/16/2024 11:26:54 AM | Judge Assigned | J-37001 | Timothy L. Sweeney |
| 3 | 5/16/2024 11:26:54 AM | Party Added | P-001 | DENNIS SOLE |
| 4 | 5/16/2024 11:26:54 AM | Party Added | P-002 | TAMMY SOLE |
| 5 | 5/16/2024 11:26:54 AM | Party Added | D-001 | EXACTECH, INC. |
| 6 | 5/16/2024 11:26:54 AM | Party Added | D-002 | EXACTECH U.S., INC. |
| 7 | 5/16/2024 11:26:54 AM | Attorney Listed | P-001 | A-9667 - Brian Joseph Headley |
| 8 | 5/16/2024 11:26:54 AM | Attorney Listed | P-002 | A-9667 - Brian Joseph Headley |
| 9 | 5/16/2024 11:26:54 AM | Attorney Listed | P-001 | A-11692 - Paul Andrew Kettering |
| 10 | 5/16/2024 11:26:54 AM | Attorney Listed | P-002 | A-11692 - Paul Andrew Kettering |
| 11 | 5/16/2024 11:26:54 AM | Service Requested | D-001 | Secretary of State - Certified - Including Copy Fee MAILED TO SEC. OF STATE |
| 12 | 5/16/2024 11:26:54 AM | Service Requested | D-002 | Secretary of State - Certified - Including Copy Fee |
| 13 | 6/3/2024 1:51:53 PM | E-Docketed | | Supporting Documents - SECRETARY OF STATE ACCEPTANCE OF SERVICE FOR EXACTECH, INC.DATED 5/23/24 |
| | 13-1  6/3/2024 | Service Return - SECRETARY OF STATE ACCEPTANCE OF SERVICE FOR EXACTECH, INC.DATED 5/23/24 | | |
| | 13-2  6/3/2024 | Transmittal | | |

**EXHIBIT A**

| User ID: | **Millie.Farnsworth** | Page 1 of 1 | Date/Time: | **6/13/24 12:02 PM** |
|---|---|---|---|---|

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



USPS CERTIFIED MAIL™



**9214 8901 1251 3410 0003 9545 18**

**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

EXACTECH, INC.
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

| | |
|---|---|
| **Control Number:** 324277 | **Agent:** Corporation Service Company |
| **Defendant:** EXACTECH, INC.<br>209 West Washington Street<br>Charleston, WV 25302 US | **County:** Pleasants |
| | **Civil Action:** 24-C-10 |
| | **Certified Number:** 92148901125134100003954518 |
| | **Service Date:** 5/23/2024 |

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office**.*

Sincerely,

*Mac Warner*

Mac Warner
Secretary of State

# SUMMONS

E-FILED | 5/16/2024 11:26 AM
CC-37-2024-C-10
Pleasants County Circuit Clerk
Millie Farnsworth

## IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA
## DENNIS SOLE v. EXACTECH, INC.

Service Type:    Secretary of State - Certified - Including Copy Fee

NOTICE TO:    EXACTECH, INC., C/O CORPORATION SERVICE COMPANY, 209 WEST WASHINGTON STREET, CHARLESTON, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Brian Headley, 297 SEVEN FARMS DR, STE 302, DANIEL ISLAND, SC 29492

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

5/16/2024 11:26:45 AM

Date

/s/ Millie Farnsworth

Clerk

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to _____ , a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

Date

Server's Signature

ACCEPTED FOR
SERVICE OF PROCESS
2024 MAY 23 P 2: 31
SECRETARY OF STATE
STATE OF WEST VIRGINIA

E-FILED | 5/16/2024 11:26 AM
CC-37-2024-C-10
Pleasants County Circuit Clerk
Millie Farnsworth

## IN THE CIRCUIT COURT OF PLEASANTS COUNTY, WEST VIRGINIA

DENNIS SOLE and TAMMY SOLE,

        Plaintiffs,

v.                                           Case No.: _____

EXACTECH, INC. and EXACTECH
U.S., INC.,

        Defendants.

### COMPLAINT

NOW COME the Plaintiffs, Dennis Sole and Tammy Sole, by counsel, Brian J. Headley, Esquire, Paul A. Kettering, Esquire, and Headley Law Firm LLC, and file the following action seeking recovery for the Plaintiffs' personal injuries and damages suffered as a result of the negligent conduct of Defendants. In support thereof, the Plaintiffs aver as follows:

1.      Plaintiffs Dennis Sole ("Dennis") and Tammy Sole ("Tammy") are adult married individuals.

2.      At all times relevant to this Complaint, Dennis and Tammy resided in Saint Mary's, Pleasants County, West Virginia.

3.      Upon information and belief, Defendant Exactech, Inc. is a Florida-based corporation licensed to do business in the State of West Virginia that develops, markets, manufactures, distributes, and sells orthopedic implant devices, related surgical instrumentation and biologic services to hospitals and physicians in the United States and internationally.

4.      Upon information and belief, Defendant Exactech U.S., Inc. is a Florida-based corporation licensed to do business in the State of West Virginia, is a wholly-owned subsidiary of Exactech, Inc. conducting Exactech, Inc.'s sales and distribution activities, and is engaged in the business of designing, developing, testing, assembling, manufacturing, packaging, labeling,

1

preparing, distributing, marketing, supplying, warranting, selling, and introducing its products. Collectively, Exactech, Inc. and Exactech U.S., Inc. are hereinafter referred to as "Exactech" or "Defendants."

5.      This Court has jurisdiction over this action as Plaintiffs are residents of the State of West Virginia and Defendants are registered to do business in the State of West Virginia.

## FACTS

### A.      Plaintiff's Total Knee Arthroplasty

6.      On January 23, 2020, Dennis presented to an orthopedic surgeon at First Settlement Orthopedics ("First Settlement") to explore treatment options for left knee pain that had plagued him for years.

7.      Dennis had tried less invasive solutions, but they provided little relief.

8.      Based on the January 23 evaluation and doctor's recommendation, Daniel subsequently underwent a total knee arthroplasty ("TKA") at Marietta Surgery Center in Marietta, Ohio on February 19, 2020.

9.      The surgeon who performed the TKA used Defendants' Optetrak Logic[1] components including, but not limited to, an Optetrak Logic posterior stabilizer (PS) tibial insert and an Optetrak Logic tibial tray.

10.      Following his TKA, Dennis did not receive the relief for which he had hoped.

11.      In January of 2021, Dennis started experiencing persistent swelling, pain, and tightness in his left knee.

12.      Dennis reported his symptoms to providers at First Settlement, who took great care to identify the cause by ordering additional imaging and labs, and prescribing antibiotics.

---

[1] Hereinafter, "Optetrak" shall be used to refer to both Optetrak and Optetrak Logic devices.

13. First Settlement also ruled out other potential causes of Dennis's problems, including blood clots and infection.

14. Despite various methods of treatment provided by First Settlement and Dennis's at-home treatment, which included icing and elevating the knee, Dennis continued to experience pain, swelling, and stiffness in his left knee.

15. These persistent problems impacted all areas of Dennis's life.

16. At work, the swelling and stiffness in Dennis's knee made simple, necessary tasks such as climbing up and down ladders very difficult.

17. At home, Dennis was an avid outdoorsman and hunter, but the complications with his knee restricted his range of motion and ability to enjoy his hobbies.

18. In June of 2022, Dennis began experiencing significant fluid accumulation in his left knee.

19. On June 16, 2022, providers at First Settlement aspirated 140 mL of cloudy fluid from Dennis's left knee.

20. Within 24 hours, the fluid returned.

21. On July 14, 2022, Dennis returned to First Settlement complaining of knee pain and persistent left knee swelling.

22. Providers at First Settlement explained that there were possibly mechanical problems in the knee that were not showing on x-rays.

23. In late February of 2023, providers at First Settlement learned that Dennis's knee components were included on a list of Exactech components that were recalled due to defective packaging that caused the components to oxidize and degrade more quickly than designed.

24.    On May 31, 2023, Dennis again returned to First Settlement complaining of issues with his left knee.

25.    A review of x-rays to Dennis's knee on that date "showed evidence of medial polyethylene wear" in his TKA implant, causing suspicion that "the polyethylene probably has [an] accelerated wear pattern and possibly even delamination."

26.    Providers at First Settlement referred Dennis to WVU Medicine Center for Joint Replacement ("WVUH") for further examination.

27.    Dennis explained to providers at WVUH that he had been dealing with left knee swelling, stiffness, and limited range of motion for months.

28.    Following an examination and evaluation of Dennis's knee, providers at WVUH recommended that Dennis undergo a left TKA revision.

29.    Prior to the revision surgery, Dennis underwent several preoperative tests and a second arthrocentesis of his left knee.

30.    On August 25, 2023, Dennis underwent a left TKA revision at J.W. Ruby Memorial Hospital in Morgantown, West Virginia.

31.    Since the left TKA revision, Dennis has experienced a dramatic improvement in the swelling, stiffness, and fluid accumulation in his left knee, and is now able to complete many of the tasks that were previously difficult for him.

**B.    Defendants' Defective Products and Subsequent Recall**

32.    Exactech's TKA systems are classified as a knee joint patellofemorotibial polymer/metal/polymer semi-constrained cemented prosthesis featuring a mix of polyethylene and metal-based components.

33.     Exactech's TKA systems are comprised of the following parts: a patellar cap, a femoral component, a tibial insert, and a tibial tray.

34.     The patellar cap and tibial tray are both made of polyethylene.

35.     Polyethylene is a polymer of ethylene, a hydrocarbon, which consists of as many as 200,000 ethylene repeat units.

36.     Ethylene is polymerized in the presence of catalysts to make ultra-high molecular weight polyethylene ("UHMWPE"), which is commercially produced as resin powder.

37.     The resin powder is then consolidated into rods and sheets from which final inserts found in TKAs are made.

38.     Polyethylene inserts cannot be exposed to oxygen during the packaging and storing process because it causes oxidation, which in turn causes premature degradation of the polyethylene insert.

39.     As such, polyethylene inserts must be handled with a high degree of care when processed, packaged, and stored.

40.     The oxidation process is time-dependent and can occur before the liner is even implanted in a patient if the liner is exposed to air.

41.     As a result, airtight packaging is crucial and requires multiple barriers that adequately prevent oxidation.

42.     Proper packaging and storage prevent oxidation and reduce the risk of failure from strength changes in the polyethylene inserts.

43.     Throughout the medical device industry, precautions are taken to ensure polyethylene components are properly packaged to avoid oxidation.

44. Polyethylene wear is a direct cause of component loosening and other component failures in TKAs, which in turn causes complications including swelling, grinding, instability, tissue damage, osteolysis, and other injuries.

45. This ultimately causes the entire systems to fail and patients to need revision surgeries.

46. Defendants touted the Optetrak system as being first-in-class in their product brochures.

47. In their marketing materials, Defendants promised that "in clinical and laboratory data," the Optetrak implants show "excellent long-term clinical outcomes" and "surgeons and patients can have every confidence in the performance and longevity of the Optetrak knee system."

48. However, upon information and belief, Defendants knew or should have known as early as 2012 that their TKA systems were failing at a higher rate than promoted in its marketing materials due to the oxygenation of the polyethylene components.

49. Reports in the Manufacturer and User Facility Device Experience (MAUDE) database in 2012 indicate instances of revision due to "loose tibial component," "aseptic loosening," "pain and visible loosening," polyethylene deformation," "polyethylene worn," and "pain, limited mobility, knee swelling and sensitivity" caused by loosening in the joint replacement.

50. In 2014, there were additional reports of "revision due to tibial loosening," "tibial loosening," "revision of [O]ptetrak knee components due to aseptic loosening," and multiple reports of "revision of knee components due to tibial loosening," and "revision of [O]ptetrak knee components reportedly due [to] aseptic loosening."

51.     Despite Defendants' knowledge of early onset failures of their TKA systems, Defendants continued to design, warrant, manufacture, promote, sell, and distribute them without alerting surgeons or patients of its potential increased risks of early onset failures.

52.     Defendants never changed the labeling, marketing materials, or product inserts to adequately and accurately warn patients or doctors of the associated increased risks of early failure due to loosening or polyethylene wear.

53.     Upon information and belief, Exactech notified distributors and sales representatives of a limited recall on approximately August 30, 2021, in a letter entitled "URGENT MEDICAL DEVICE RECALL."

54.     In part, the letter clarified that Exactech was "removing all knee and ankle UHMWPE products labeled with an 8-year shelf life and not packaged in EVOH/Nylon bags, in a phased approach over 12 months."[2]

55.     The reason for the recall as stated in the notification was "Inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer."[3]

56.     Notably, Defendants did not issue any communications to surgeons who had implanted Optetrak systems with a recalled polyethylene component.

57.     Defendants did not issue any communications to patients who had received an Optetrak system with a recalled polyethylene component.

58.     It took nearly six (6) months for Exactech to notify patients, doctors, and the public that its Optetrak systems were defective and contained faulty polyethylene liners.

---

[2] *See* U.S. FOOD & DRUG ADMIN., *Class 2 Device Recall OPTETRAK Comprehensive Knee System* (Oct. 04, 2021) https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRES/res.cfm?id=189015.
[3] *Id.*

7

59. On April 7, 2022, Exactech issued an "Urgent Medical Device Correction" in which it informed health care professionals that:

> After extensive testing, we have confirmed that approximately 80% of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "non-conforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**[4]

60. The "Urgent Medical Device Correction" clarified that Exactech was expanding its recall to now include "all knee and ankle arthroplasty polyethylene inserts packaged in non-conforming bags **regardless of label or shelf life.**" The components subject to the recall now included: OPTETRAK: All polyethylene CR Tibial Components, All-polyethylene PS Tibial Components, B-Series Ps Tibial Insert, CC Tibial Inserts, CR Tibial Inserts, CR Slope Tibial Inserts, PS Tibial Inserts, CUSTOM OPTETRAK Angled PS Insert, CUSTOM OPTETRAK CC Tibial Insert, OPTETRAK HI-FLEX PS Tibial Inserts, OPTETRAK "MOMB" Non-Mod Molded Insert, OPTETRAK RBK PS Tibial Components; OPTETRAK Logic: CR Tibial Inserts, CR Slope Tibial Inserts, CRC Tibial Inserts, PS Tibial Inserts, PSC Tibial Inserts, CC Tibial Inserts.[5]

61. The "Urgent Medical Device Correction" also advised surgeons to "maintain an appropriate index of suspicion for patients with any new or worsening pain, inability to bear weight, grinding or other noise, swelling, or instability in their knee or ankle…The reasons for

---

[4] *See* Exactech's "Urgent Medical Device Correction" letter, dated Apr. 7, 2022, available online at: https://www.exac.com/wp-content/uploads/2022/04/Exactech-DHCP-letter.4.6.2022.pdf
[5] *Id.*

these increased revision diagnoses related to accelerated polyethylene wear may be related to the non-conforming packaging."[6]

## COUNT I: NEGLIGENCE

62. Plaintiffs hereby incorporate Paragraphs 1 through 61 as though fully set forth herein.

63. At all times relevant to this Complaint, Defendants owed a duty to exercise reasonable care to its consumers, including Dennis, in the testing, study, research, design, development, manufacture, testing, inspection, packaging, promotion, advertisement, marketing, distribution, and/or sale of Optetrak systems for implantation by orthopedic surgeons in the United States.

64. As medical device manufacturers and distributors, Defendants owed this duty of reasonable care not only to patients, like Dennis, but also to doctors, like Dennis's implanting physician.

65. Prior to, on, and after the dates of Dennis's initial knee replacement surgery, Defendants breached this duty, and failed to exercise reasonable care and were grossly negligent and careless in the testing, study, research, design, development, manufacture, testing, inspection, packaging, promotion, advertisement, marketing, distribution, and/or sale of the device.

66. Following Dennis's initial knee replacement surgery, Defendants breached this duty and failed to exercise reasonable care and were grossly negligent and careless in failing to recall the device.

---

[6] *Id.*

9

67. At all times relevant to this Complaint, the Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers associated with the Optetrak systems.

68. Despite the fact Defendants knew or should have known the Optetrak systems posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the Optetrak systems for implantation into consumers without revising any warning language or issuing an earlier recall.

69. Defendants failed to advise surgeons and patients of the need for regular follow-up beyond the ordinary practices after a knee implant as to promptly detect polyethylene degradation and osteolytic failure and timely revise the device to prevent pain, swelling, and related injuries and/or other adverse events caused by the device.

70. Defendants failed to exercise due care under the circumstances, and their gross negligence and recklessness includes the following acts and omissions:

   a. Negligently failing to properly package the polyethylene components of the Optetrak device;

   b. Negligently failing to properly package the polyethylene components of the device so as to prevent oxidation, contamination, and patient pain and swelling;

   c. Negligently failing to properly supervise and monitor the production and packaging of the polyethylene components used in the Optetrak devices;

   d. Negligently failing to properly and thoroughly select the material used in the Optetrak devices;

   e. Negligently failing to properly and adequately test the Optetrak devices and their attendant parts before releasing the devices to marker;

   f. Negligently failing to conduct sufficient post-market testing and surveillance of the defective Optetrak devices;

   g. Negligently failing to adequately prevent, identify, mitigate, and fix defective designs and hazards associated with the defective Optetrak devices in accordance with good practices;

h. Negligently designing, manufacturing, packaging, marketing, advertising, distributing, and selling the Optetrak devices;

i. Continuing to negligently manufacture and distribute the defective Optetrak devices after the Defendants knew or should have known of their adverse effects and/or the increased early onset failure rates; and

j. Negligently violating applicable state and federal laws and regulations.

71. Defendants knew and/or should have known that it was foreseeable that consumers such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary care in the testing, study, research, design, development, manufacture, testing, inspection, packaging, promotion, advertisement, marketing, distribution, and/or sale of the device.

72. As a direct and proximate result of the foregoing acts, omissions, and conduct committed by the Defendants, Plaintiffs were caused to sustain serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

## COUNT II: FAILURE TO WARN

73. Plaintiffs hereby incorporate Paragraphs 1 through 72 as though fully set forth herein.

74. At all times relevant to this Complaint, Defendants designed, tested, developed, manufactured, labeled, packaged, marketed, distributed, or sold the device for implantation into patients, such as Dennis, by orthopedic surgeons in the United States.

75. At all times relevant to this Complaint, while Defendants engaged in the business of designing, manufacturing, selling, marketing, promoting, and placing into the steam of commerce the device, the product contained defects that made it unreasonably dangerous beyond the expectations of the ordinary consumer, such as Dennis, and were unfit for their intended use.

11

76. The Optetrak device reached Dennis without substantial change in the condition in which it was designed, developed, promoted, manufactured, and sold.

77. At the time and on the occasions in question, the device was being properly used for the purpose in which it was intended, and such device was in fact defective, unsafe, and unreasonably dangerous.

78. At all times relevant to this Complaint, the dangerous propensities of the device were known to Defendants or were reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold their respective product, and not known to ordinary consumers.

79. The device was defective and unreasonably dangerous when it entered the stream of commerce and was received by Dennis and his doctors, because the warnings in the instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications provided by Defendants or their sales force to doctors and patients with or about the Optetrak system failed to adequately convey the potential risks and side effects of the Optetrak system and the dangerous propensities of the device, which risks Defendants knew or reasonably should have known.

80. The device was defective due to inadequate, or the absence of, warnings or instructions, including warning stickers, placards, or proper documentation to alert users regarding the hazards posed by the device.

81. Defendants further failed to adequately disclose the device's propensity to undergo substantial early polyethylene wear, component loosening or other failure causing serious complications, including grinding, swelling, tissue damage, instability, osteolysis, bone loss and other injuries, as well as the need for revision surgery in patients.

12

82.    The instructions for use, operative techniques, directions, marketing and promotional materials, advertisements, white papers, and other communications regarding the Optetrak system were additionally defective because they did not provide instructions concerning how, if at all, the risks associated with the Optetrak system could be avoided, minimized, detected, or treated.

83.    The inadequate warnings for the device existed when the device left Defendants' control.

84.    Defendants failed to exercise reasonable care to inform Dennis, Dennis's doctors, and the medical community about dangers regarding the device.

85.    Dennis's doctor followed the instructions provided by Defendants with regard to the implantation of the device.

86.    Dennis and Dennis's doctor could not, by the exercise of reasonable care, have discovered these defects and perceived its dangers or avoided injury.

87.    By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Dennis was caused to sustain serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages and loss of earning capacity.

88.    Defendants are strictly liable for providing inadequate warnings accompanying the device and its component parts, including the packaging of the device.

**COUNT III: DESIGN DEFECT**

89.    Plaintiffs hereby incorporate Paragraphs 1 through 88 as though fully set forth herein.

90.     At all times relevant to this Complaint, Defendants designed, tested, developed, manufactured, labeled, packaged, marketed, distributed, or sold the Optetrak system for implantation into patients, such as Dennis, by orthopedic surgeons in the United States.

91.     Defendants had a duty to develop, design, and test both the device and its component parts, including the respective packaging of each, to produce a product that did not present an unreasonable risk of harm or injury to patients, including Dennis.

92.     At the time that Defendants designed, tested manufactured, packaged, promoted, marketed, sold, supplied, distributed and/or serviced the device, it contained defects that made it unreasonably dangerous beyond the expectations of the ordinary consumer, and were unfit for their intended use.

93.     Defendants knew or reasonably should have known that the Optetrak system, as designed, presented an unreasonable risk of harm or injury to patients, including Dennis.

94.     Defendants knew or reasonably should have known that the Optetrak system was not reasonably safe for its expected, intended, or foreseeable uses as designed by Exactech.

95.     The device reached Dennis without substantial change in the condition in which it was sold.

96.     At the time and on the occasions in question, the device was being properly used for the purpose for which it was intended, and such device was in fact defective, unsafe, and unreasonably dangerous.

97.     The device, as tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold by the Defendants reached Dennis without substantial change in its condition.

14

98.     As alleged herein, the Defendants knew or had reason to know that the device caused an increased risk of harm to Dennis and other consumers due to the device's propensity to undergo substantial polyethylene wear, component loosening, contamination, and/or other failure causing serious complications including pain, swelling, and other injuries, as well as the need for revision surgery in patients.

99.     The device, including its component parts and corresponding packaging, was defective as designed because Defendants:

a.  Developed the Optetrak system in a manner which resulted in a propensity to undergo substantial early polyethylene wear, component loosening, or other failure modes;

b.  Failed to design the packaging for the polyethylene components of the Optetrak system in vacuum bags that contained a secondary barrier layer to prevent the components from undergoing increased oxidation;

c.  Designed the packaging of the Optetrak system and its component parts to require materials which were of an inferior grade or quality;

d.  Failed to conduct adequate testing on component parts, subassemblies, or the finished Optetrak system as packaged and distributed;

e.  Failed to test an adequate number of samples of the Optetrak system on an ongoing basis to ensure it was safe and performed as designed;

f.  Failed to take adequate steps to specifically identify failure modes with the Optetrak system with clarity to suggest methods to monitor, avoid, or prevent further failures;

g.  Failed to identify or note the significance of any testing that resulted in failures of the Optetrak system;

h.  Failed to take corrective actions to eliminate or minimize further failures of the Optetrak system;

i.  Failed to adequately design packaging specifications for the components, subassemblies, or the finished Optetrak system;

j.  Designed the polyethylene insert and packaging in a manner that increased the risk of users and patients suffering from pain, discomfort, injury and the need for revision surgery; and

15

k.  Otherwise failed to adequately develop, design, or test the Optetrak system.

100.  The device and packaging as designed carried risks that were outweighed by any utility of the design of the device and packaging because when paired together with the implant, the device was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and at no time did Dennis have reason to believe that the device was in a condition not suitable for proper and intended use.

101.  The device and packaging were defective in design and unreasonably dangerous when it entered the stream of commerce and was received by Dennis, because the foreseeable risks exceeded or outweighed the purported benefits associated with the device.

102.  Feasible safer alternative designs providing the same functional purpose were available to the Defendants at the time the device was designed and packaged and offered for sale in the market.

103.  For example, Defendants could have utilized vacuum bags containing a secondary barrier layer containing ethylene vinyl alcohol (EVOH), like other manufacturers in the industry do, to prevent the polyethylene components from undergoing increased oxidation.

104.  The design defects of the device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Dennis, when used and operated for the purposes intended by the Defendants.

105.  The design defects of the device and corresponding packaging presented an unreasonable risk of harm to users and patients exposed to their danger, including Dennis, when they were used and operated in a manner that was foreseeable to the Defendants.

106.  Dennis could not, by the exercise of reasonable care, have discovered these design defects and perceived its dangers or avoided injury.

107. The Defendants are strictly liable for the defective design of the device; defective design of the packaging of the device; the distribution, marketing, and/or sale of the device; and the injuries sustained by Dennis.

108. By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Dennis sustained serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

## COUNT IV: MANUFACTURING DEFECT

109. Plaintiffs hereby incorporate Paragraphs 1 through 108 as though fully set forth herein.

110. At all relevant times, Exactech designed, tested, developed, manufactured, labeled, packaged, marketed, distributed, or sold the Optetrak system for implantation into patients, such as Dennis, by orthopedic surgeons in the United States.

111. Exactech had a duty to manufacture, pack, and distribute the Optetrak system, including its component parts, in a manner that prevented unreasonable risk of harm or injury to patients, including Dennis.

112. Exactech knew or reasonably should have known that its Optetrak system was defective as manufactured.

113. The Optetrak system, as manufactured, was not reasonably safe as manufactured, packaged, or distributed by Exactech.

114. The Optetrak system, including its component parts, were defective as manufactured because Exactech:

17

a. Packaged the polyethylene components of the Optetrak system in vacuum bags that did not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) to prevent the components from oxidizing before they were implanted;

b. Selected materials to package the Optetrak system, which were of an inferior grade or quality;

c. Failed to set appropriate manufacturing specifications to ensure that the Optetrak system performed safely, appropriately, and as intended;

d. Failed to periodically test to ensure that the Optetrak system as manufactured met Exactech's intended specifications;

e. Failed to establish internal quality control protocols and procedures to ensure that the Optetrak system as manufactured met Exactech's intended specifications;

f. Failed to comply with internal quality control protocols and procedures to ensure that the Optetrak system as manufactured met Exactech's intended specifications;

g. Failed to take corrective actions to eliminate or minimize further failures of the Optetrak system;

h. Failed to select appropriate third-parties to package the polyethylene inserts used in the Optetrak system;

i. Failed to properly supervise and monitor the packaging of the polyethylene inserts used in the Optetrak system; and

j. Otherwise failed to adequately manufacture, package, or distribute the Optetrak system.

115. The manufacturing defects in the Optetrak system existed when the device left Exactech's control.

116. Dennis's doctors implanted the Optetrak system in the manner in which it was intended and recommended to be used, making such use reasonably foreseeable to Exactech.

117. The Optetrak system, including its component parts, which was manufactured, packaged, or distributed by Exactech, reached patients, like Dennis, without substantial change in condition.

18

118. Dennis could not, by exercise of reasonable care, have discovered the manufacturing defect and perceived its dangers or avoided injury.

119. Exactech is strictly liable for the defective manufacture of its Optetrak system, the distribution, marketing, or sale of the defectively manufactured Optetrak system, and the injuries sustained by Dennis.

120. As a direct and proximate result of one or more of these wrongful acts or omissions by Exactech, Dennis sustained serious personal injuries and resulting damages in the past, and will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

### COUNT V: NEGLIGENT MISREPRESENTATION

121. Plaintiffs hereby incorporate Paragraphs 1 through 120 as though fully set forth herein.

122. Defendants made statements concerning material facts which Defendants may have believed to be true but which in fact were false, or otherwise omitted material facts, including but not limited to:

    a. Defendants knew the PS tibial insert within the device was failing at a high rate and failed to disclose this information to Dennis and/or Dennis's surgeon prior to installation of the device;

    b. Defendants knew that other patients experienced problems with the device, including but not limited to, osteolysis, loosening of the components, deterioration of the polyethylene, and reports of significant pain, all prior to the installation of the device in Dennis, and failed to disclose such information to Dennis and/or Dennis's surgeon;

    c. Defendants represented to Dennis and/or Dennis's surgeon, prior to the implantation of the PS tibial insert within the device, that the PS tibial insert was clinically proven to reduce wear when, in fact, no clinical trials were submitted for approval by the FDA;

19

d. Defendants failed to disclose to Dennis's surgeon prior to the installation of the device in Dennis's body that they were aware of and/or witnessed revision surgeries in which the device failed, including becoming loose, causing osteolysis, and causing excessive wear;

e. Representing the PS tibial insert within the device to have lower wear propensities than comparable products;

f. Representing that the PS tibial insert within the device liner would last for a lifetime;

g. Representing the PS tibial insert within the device to have better longevity than comparable products;

h. Failing to inform Dennis and the public of the risk of injury after being informed of the increased rate of wear-related adverse events with Defendants' other "enhanced" polyethylene products;

i. Failing to inform Dennis and the public of any potential risks related to Defendants' increased knowledge of problems associated with the PS tibial insert within the device until Defendants had already designed and released a marketable replacement for the PS tibial insert;

j. Doing all of the above with the intent of selling more knee replacements and creating demand for Defendants' systems by using deceptive or untrue statements of fact about the safety and benefits of the device, including its PS tibial insert.

123. Defendants were negligent in making such statements because they knew or should have known the statements were false or omitted material information.

124. In making these statements, Defendants intended or expected that another would rely on the statements.

125. Dennis, through his surgeon, justifiably relied on the false statements.

126. By reason of the foregoing acts, omissions, and conduct committed by the Defendants, Dennis sustained serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

## COUNT VI: BREACH OF EXPRESS WARRANTY

127.    Plaintiffs hereby incorporate Paragraphs 1 through 126 as though fully set forth herein.

128.    Prior to Dennis's initial knee replacement surgery, and at all times relevant to this Complaint, Defendants tested, studied, researched, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the device for implantation into consumers, such as Dennis, by orthopedic surgeons in the United States.

129.    Defendants expressly warranted the device was a safe and effective orthopedic device.

130.    At the time the Defendants manufactured, marketed, sold and/or distributed the device, they knew that the device was intended for human use, and that Dennis was a foreseeable user of the device.

131.    The express warranties represented by the Defendants were a part of the basis for Dennis's use of the device, and Dennis and his surgeon relied on these warranties in deciding to implant the device.

132.    At the time of the making of the express warranties, the Defendants had knowledge of the purpose for which the device was to be used and warranted the same to be in all respects safe, effective, and proper for such purpose.

133.    The device does not conform to these express representations as demonstrated by the fact that Dennis's implant failed prematurely and caused him to suffer regular pain, swelling, and fluid accumulation which necessitated Dennis to undergo revision surgery.

21

134. At the time the Defendants marketed, sold and/or distributed the device, Defendants expressly warranted that the device, including all of its component parts, were safe and merchantable for its intended use.

135. Dennis and Dennis's surgeon reasonably relied upon the Defendants' express warranties.

136. Dennis used the device for its intended purpose, and in a reasonably foreseeable manner.

137. The device manufactured and sold by the Defendants did not conform to the Defendants' express representations because the device caused serious injury to Dennis when used as recommended and directed.

138. As a direct and proximate result of the Defendants' acts and omissions, including breach of express warranty, Dennis was implanted with the device and sustained serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

**COUNT VII: BREACH OF IMPLIED WARRANTY**

139. Plaintiffs hereby incorporate Paragraphs 1 through 138 as though fully set forth herein.

140. Prior to Dennis's initial knee replacement surgery, and at all times relevant to this Complaint, Defendants tested, studied, research, designed, formulated, manufactured, inspected, labeled, packaged, promoted, advertised, marketed, distributed, and/or sold the device for implantation into consumers, such as Dennis, by orthopedic surgeons in the United States.

22

141. Defendants impliedly warranted, through its marketing, advertising, distributors, and sales representatives, that the device was of merchantable quality, and fit for the ordinary purposes and uses for which it was sold.

142. In fact, the device was not of merchantable quality nor fit for the ordinary purposes and uses for which it was sold and did not meet the expectations of consumers.

143. The device manufactured and supplied by Defendants was not of merchantable quality and was not fit for the ordinary and/or particular purpose for which it was intended as physicians and patients would expect the components to be properly manufactured, treated to prevent oxidation, and packaged and stored as to avoid premature degradation of component materials and to prevent pain, swelling, and revision surgery in patients.

144. Dennis and/or Dennis's surgeon reasonably relied upon the skill and judgment of the Defendants as to whether the device was of merchantable quality and safe for its intended and particular use and purpose.

145. Contrary to such implied warranties, the device was not of merchantable quality or safe for its intended and particular use and purpose, because Defendants failed to prevent the components from undergoing increased oxidation and causing patients to experience substantial polyethylene wear, component loosening, and/or other failure causing serious complications including pain, swelling, and other injuries as well as the need for revision surgery.

146. As a direct and proximate result of Defendants' acts and omissions, including breach of implied warranties, Dennis was implanted with the device and sustained serious personal injuries and resulting damages in the past, and which will continue in the future, including pain and suffering, physical impairment, mental anguish, medical expenses, lost wages, and loss of earning capacity.

23

## COUNT VIII: LOSS OF CONSORTIUM

147. Plaintiffs hereby incorporate Paragraphs 1 through 146 as though fully set forth herein.

148. As a result of Dennis's injuries, Tammy Sole has suffered a loss of services, society, comfort, and enjoyment of life.

## CONCLUSION

WHEREFORE, the Plaintiffs pray that this Honorable Court award them damages in excess of the jurisdictional minimums of this Court and in an amount sufficient to compensate them fully for their injuries as set forth herein, including an award of attorney's fees, costs, expenses, punitive damages, and such other relief as the Court deems necessary.

## THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY.

Respectfully submitted,

By: /s/ Brian J. Headley
Brian J. Headley, Esquire
W. Va. I.D. No. 9667
Paul A. Kettering, Esquire
W. Va. I.D. 11692
297 Seven Farms Drive, Suite 302
Daniel Island, SC 29492
brian@headleyfirm.com
paul@headleyfirm.com
Tel.: (843) 375-6181
Fax: (843) 375-6185
*Counsel for Plaintiffs*

24

CERTIFIED MAIL



US POSTAGE PITNEY BOWES

ZIP 25311    $ 009.07
02 4W
0000377388 MAY. 24. 2024



BUSINESS & LICENSING
1610 - 00